IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| CORVALLIS HOSPITALITY, LLC,<br>an Oregon limited liability company, | Case No. 6:22-cv-00024-MC |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| WILMINGTON TRUST, NATIONAL<br>ASSOCIATION, as Trustee for the Benefit of<br>the Holders of LCCM 2017-LC26 Mortgage<br>Trust Commercial Mortgage Pass-Through<br>Certificates, Series 2017-LC26; MIDLAND<br>LOAN SERVICES, INC., a Delaware<br>Corporation; BEACON DEFAULT<br>MANAGEMENT, INC., a California<br>Corporation; and K-STAR ASSET<br>MANAGEMENT, LLC, a Delaware limited<br>liability company, | |
| Defendants. | |

_____

MCSHANE, Judge:

Plaintiff Corvallis Hospitality, LLC ("CH") took out an $18 million loan backed and serviced by Defendants. During the COVID-19 pandemic, Plaintiff stopped making payments and asserted the protection of Oregon House Bill 4204 ("HB 4204"), which prohibited lenders from declaring default and imposing fees for a borrower's failure to pay because of lost revenue caused by the pandemic. Defendants eventually declared default, and Plaintiff sued for breach of contract, breach of the covenant of good faith and fair dealing, conversion, an accounting, and a declaratory judgment. Defendants counterclaimed for breach of contract.

Plaintiff and Defendants move for summary judgment, and Plaintiff moves for sanctions. Because HB 4204 was preempted by federal law and Plaintiff has not established that Defendants otherwise acted unlawfully, Plaintiff's Motion for Summary Judgment is DENIED and Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part. Plaintiff's Motion for Sanctions is also DENIED.

## BACKGROUND

### I. The Parties

Plaintiff Corvallis Hospitality, LLC is the owner and operator of the Hilton Garden Inn Corvallis, a hotel located on the campus of Oregon State University. Second Am. Compl. ("SAC") ¶ 1, ECF No. 126; Defs.' Answer Am. Compl. ("Answer") ¶ 1, ECF No. 64. William Lawson, defendant in related case *Wilmington Trust v. Lawson*, No. 22-CV-993, is the Managing Member and majority owner of CH. Watnick Decl. Supp. Defs.' Mot. Summ. J. ("Watnick MSJ Decl.") Ex. 4, at 131, ECF No. 142.

Defendant Wilmington Trust is the current beneficiary of the Deed of Trust that secures a Loan Plaintiff took out in 2017. SAC ¶ 10; Answer ¶ 9; Decl. Jeff McKee Supp. Pl.'s Mot. Summ. J. ("McKee MSJ Decl.") ¶ 4, Ex. C, ECF No. 145. Defendant Beacon Default Management, Inc. is the successor trustee under the Deed of Trust. SAC ¶ 4; Answer ¶ 4. Defendant Midland Loan Services, a division of PNC Bank, National Association, was special servicer for the Loan in 2020. *See, e.g.*, Watnick MSJ Decl. Ex. 8. Defendant K-Star Asset Management, LLC took over special servicing for the Loan as of April 24, 2023. SAC ¶ 5; Answer ¶ 2, n.1.

### II. The Loan Agreement & Commercial Mortgage Backed Securities Structure

On May 3, 2017, Plaintiff entered into a Loan Agreement with Ladder Capital Finance, LLC, evidenced by a promissory note for the principal amount of $18,000,000. McKee MSJ Decl.

2. The parties intended that the Loan would be securitized into a Commercial Mortgage Backed Securities ("CMBS") structure. Watnick MSJ Decl. Ex. 1, at 29:9–30:4; *id.* at Ex. 5, at 25:11–13.

In a CMBS transaction, multiple mortgage loans are pooled together and transferred to a trust that issues bonds to investors. Hambly Decl. Supp. Pl.'s Mot. ("Hambly MSJ Decl.") Ex. A, at 1, 6. Loan servicers then work with the borrowers to service the loans in accordance with the bondholders' interests. *Id.* at 7; Schleicher Decl. Supp. Pl.'s Mot. ("Schleicher MSJ Decl.") Ex. 2, at 27:8–25, ECF No. 147. The ultimate bondholder is known as the Directing Certificate Holder, which in this case is an entity affiliated with KKR & Co., Inc., aka Kohlberg, Kravis & Roberts & Co., KKR Real Estate Credit Opportunity Partners Aggregator I L.P. Schleicher MSJ Decl. Ex. 2, at 23:4–24:3. Defendant K-Star is a wholly owned subsidiary of KKR. *Id.* KKR has consent rights as to "Major Decisions" associated with the CH Loan. Hambly MSJ Decl. Ex. A, at 7; Schleicher MSJ Decl. Ex. 2, at 27–31.

### III. HB 4204

On June 30, 2020, Oregon Governor Kate Brown signed into law House Bill 4204, which created a COVID-19 "emergency period" from March 8, 2020, to September 30, 2020. H.B. 4204, 80th Leg., 1st Spec. Sess. (Or. 2020). Governor Brown later extended the emergency period to December 31, 2020. Exec. Order No. 20–37. The purpose of HB 4204 was to temporarily protect borrowers experiencing pandemic-related financial hardships from going into default if they missed monthly payments on their loans.

Under HB 4204, an eligible borrower could (a) defer payments during the emergency period until maturity and pay no interest or fees, or (b) "agree to modify, defer or otherwise mitigate a loan[.]" H.B. 4204 § 1(3)(a). The bill prohibited lenders declaring default, imposing

fines or late fees, or initiating foreclosure actions against borrowers for payments missed during the emergency period. HB 4204 § 1(3)(a).

## IV. Plaintiff's Missed Payments, Attempted Negotiations & Alleged Default

During the COVID-19 pandemic, Plaintiff could not serve guests and suffered economic losses as a result. McKee MSJ Decl. 3. In March of 2020, CH's financial advisor, Jeff McKee, requested that CH's Loan be placed in special servicing so that the parties could begin negotiating a workout solution for repayment of the Loan. Watnick MSJ Decl. Ex. 5, at 35:8–37:7; *id.* at Exs. 6–7.

On May 6, 2020, CH did not make its payment when due, and instead, on May 19, 2020, Mr. McKee notified a Midland representative that CH was suffering financial losses and proposed terms for a workout solution. Watnick MSJ Decl. Ex. 11, at 5, 19; *id.* at Ex. 13. On July 17, 2020, McKee notified Midland that CH would not make payments for May, June, or July of 2020. *Id.* at 4. McKee also sent Welek another proposal for a loan modification. McKee MSJ Decl. 4–5.

On October 7, 2020, the Trust, through outside counsel, notified CH of the Trust and Midland's position that the Loan was in default for the missed payments in May through October and "that the provisions of Oregon House Bill 4204 are preempted by federal law." *Id.* at Ex. L, at 2. The letter notified Plaintiff that "the Loan ha[d] been accelerated and all amounts under the Loan Documents [were] [then] due and payable." *Id.* at 1.

CH began making partial payments that month, and McKee sent a new proposal to the Trust and Midland on October 26, 2020. McKee MSJ Decl. 6. On December 2, 2020, Midland, through Welek, rejected the terms of CH's proposal. *Id.* at 7.

Plaintiff failed to make timely monthly payments in January, February, and March of 2021. Watnick MSJ Decl. Ex. 13, Ex. 30, at 1 (March 31, 2021 correspondence). On January 27, 2021,

Midland informed CH that the Trust was moving toward foreclosure. *Id.* CH proposed another workout solution on March 2, 2021. Watnick MSJ Decl. Ex. 31.

On March 31, 2021, the Trust, through outside counsel, sent Plaintiff a letter stating that failure to make timely payments in January, February, and March of 2021 constituted events of default. McKee MSJ Decl. Ex. U, at 1. The Trust demanded "immediate payment" of $1,118,422.22, which included $439,427.34 in monthly loan payments and around $500,000 in default interest in fees. *Id.* at 2. On April 15, 2021, the Trust sent Plaintiff a "reservation of rights letter" indicating that the Trust received partial payments between October of 2020 and April of 2021. *Id.* at Ex. V, at 2. That letter notified Plaintiff that notwithstanding the Trust's acceptance of those partial payments, CH "remain[ed] in default under the Loan Documents, and all outstanding amounts remain[ed] due and payable." *Id.*

On April 19, 2021, the Trust, through Beacon, recorded a Notice of Default and Election to Sell contending that CH missed payments in January through April 2021. McKee MSJ Decl. 8, Ex. W. CH resumed full payments that month and began overpaying to cover the amounts not paid during the Emergency Period. *Id.* at 9. By Mr. McKee's calculations, those payments resulted in an estimated $1,259.954.73 being "overpaid" to Defendants as of August of 2024. *Id.* at 10.

On August 13, 2021, Welek notified CH that it remained in default because of its failure to make payments in May through October of 2020. *Id.* at 9, Ex. X.

**V. Claims at Issue**

Plaintiff brings the following claims before the Court: (I) Breach of Contract (against the Trust); (II) Breach of the Covenant of Good Faith and Fair Dealing (against the Trust, Midland, and K-Star); (III) Accounting (against the Trust, Midland, and K-Star); (IV) Declaratory Judgment (against all Defendants); and (V) Conversion (against the Trust, Midland, and K-Star). SAC ¶¶

67–102. Defendants allege counterclaims for breach of contract, judicial foreclosure, and appointment of a receiver. Answer 29.

In related case number 22-993, Defendants allege a claim for breach of guaranty against William Lawson, as CH's Managing Member and majority owner. Compl. 10, ECF No. 1, No. 22-cv-993 ("The Trust's Complaint").

Plaintiff moves for summary judgment in favor of its claims, against Defendants' counterclaims, and in Mr. Lawson's favor against the Trust's Complaint. Plaintiff also filed a Motion for Imposition of Sanctions alleging that Defendants spoliated evidence. ECF Nos. 143, 151. Defendants move for summary judgment in favor of its counterclaims and against Plaintiff's claims. ECF No. 141.

## LEGAL STANDARD

On a motion for summary judgment, the moving party bears an initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine" dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)). A dispute is considered "genuine" if the "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it could affect the outcome of the case. *Id.* The court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)).

## DISCUSSION

## I. Plaintiff's Motion for Sanctions

Plaintiff CH alleges that Defendants spoliated relevant evidence by failing to preserve certain emails. Plaintiff moves for sanctions pursuant to Fed. R. Civ. P. 37 and the Court's inherent authority, seeking dismissal of Defendants' counterclaims, or in the alternative, inferences in Plaintiff's favor.

Rule 37(e) enables the Court to order curative measures if electronically stored information was lost because of a party's failure to preserve it "and it cannot be restored or replaced through additional recovery[.]" Fed. R. Civ. P. 37(e). If the Court finds the loss caused another party prejudice, the Court "may order measures no greater than necessary to cure the prejudice[.]" Fed. R. Civ. P. 37(e)(1). Additionally, if the Court finds that the party acted with intent to deprive the other of the information, the Court may presume that the lost information was unfavorable or "dismiss the action and enter a default judgment." Fed. R. Civ. P. 37(e)(2). Dismissal is proper only where there is willfulness, fault, or bad faith. *Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 348 (9th Cir. 1995).

The Court may also issue sanctions under its inherent authority for "willful disobedience of a court order . . . or when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980). Under that standard, the litigant must have "engaged in bad faith or willful disobedience of a court's order." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991). Ordinary negligence or inadvertence does not justify punitive sanctions. *Zambrano v. City of Tustin*, 885 F.2d 1473, 1483–85 (9th Cir. 1989).

Plaintiff argues Defendant Midland failed to put timely litigation holds on the email accounts of six witnesses that contained information relevant to Plaintiff's claims. Most importantly, email communications from two key former Midland employees, Thomas Welek and Samuel Todd, were deleted when the employees left Midland. Defendant Midland admits that "it

inadvertently did not override the scheduled, automated deletion of some internal emails belonging to a few witnesses" after they left Midland's employment. Defs.' Resp. Pl.'s Mot. Sanctions, ECF No. 167; *see also* Decl. Chad Milbrandt Supp. Defs.' Partial Opp. Mot. Extend ¶ 3, ECF No. 75 ("By default and according to Midland's standard email retention policy, when an employee's employment with Midland is terminated, that employee's email account is automatically disposed of 25 days after the employee's termination of employment[.]").

As noted above, sanctions are only available under Rule 37(e) if Plaintiff suffered prejudice or Defendants acted with intent to deprive Plaintiff of the information. Here, the evidence shows that Defendants did not intend to withhold information from Plaintiff. *See* Defs.' Opp. Mot. Sanctions 2, ECF No. 167 (stating that the mistake was an honest, inadvertent, "unfortunate administrative oversight"); Decl. Chad Milbrandt Supp. Defs.' Partial Opp. Mot. Extend ¶¶ 3, 6 (noting that email accounts are "automatically disposed" and that "Mr. Welek's and Mr. Todd's email accounts were not intentionally disposed of").

Defendants have also taken significant good faith remedial measures to produce the lost emails, further illustrating their lack of intent to deprive Plaintiff of the information. Defendants notified Plaintiff of the missing emails on July 7, 2023, and performed a company-wide search for the emails relating to CH's loan in order to produce thousands of communications. Decl. David Watnick Supp. Defs.' Opp. Mot. Sanctions 2–3, ECF No. 147. Plaintiff also received production of third-party communications with Midland employees and has preserved its own communications with Midland. *Id.* at 3. According to Defendants, the only communications not produced to CH were communications *with* CH, which CH would be in possession of because it was a party to them. Defendants' evidence of administrative oversight combined with their efforts to recover the lost emails show that there was no intent to deprive Plaintiff of that information.

Defendants' lack of willfulness or bad faith also precludes the sanction of dismissal or sanctions pursuant to the Court's inherent authority. Accordingly, the availability of sanctions turns on whether Plaintiff suffered prejudice. Fed. R. Civ. P. 37(e)(1). Plaintiff alleges that it is severely prejudiced because CH is unable to obtain records of Todd's and Welek's communications with each other, with other Midland employees, or with third parties.

As discussed below, however, the merits of this dispute depend on whether Plaintiff defaulted on its loan and whether Defendants acted within their rights when servicing the loan and declaring default. No communication from Midland employees could alter the terms of the contract or the occurrence of loan payments. The Court has significant evidence before it, including Todd's and Welek's emails, and Plaintiff has not pointed to any information that might have been lost that would assist it in this case. Because Plaintiff has not established that it suffered prejudice from Defendants' mistake, Plaintiff's Motion for Sanctions is DENIED. *See Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc.,* 306 F.3d 806, 824–25 (9th Cir. 2002) (upholding decision to decline to draw adverse inference where loss was accidental and plaintiff was not prejudiced).

## II. Defendants' Motion for Summary Judgment

### a. National Bank Act's Preemption of HB 4204

Several of Plaintiff's theories of liability rely on the argument that HB 4204 prohibited Defendants from declaring default, and doing so was a breach of the Loan Agreement and of the covenant of good faith and fair dealing.

Defendants argue that the National Bank Act preempts HB 4204. The National Bank Act preempts HB 4204's prohibition on declaring default if that prohibition "prevents or significantly interferes with" the exercise of powers provided by the National Bank Act. 12 U.S.C. 25b(b)(1)(B) ("State consumer financial laws are preempted" if the "law prevents or significantly interferes with

the exercise by the national bank of its powers[.]”); *Cantero v. Bank of Am., N.A.*, 602 U.S. 205, 219–20 (2024) (citing *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 32 (1996)).

To start, Plaintiff argues that HB 4204 applies because the Loan Documents explicitly incorporate Oregon law. *See* McKee MSJ Decl. Ex. A, at § 11.13. But as Defendants point out, a “generic reference to Oregon law does not somehow reverse-preempt the NBA.” Defs.’ Resp. 18; *see also DirecTV, Inc. v. Imburgia*, 577 U.S. 47, 55 (2015) (“Absent any indication in the contract that this language is meant to refer to *invalid* state law,” a choice-of-law provision “presumably takes its ordinary meaning: *valid* state law.”).

The parties also dispute whether Defendants are national banks governed by the NBA. Defendants Wilmington Trust and Midland are the entities whose conduct HB 4204 purported to regulate, so their statuses as national banks are the ones at issue. A “national bank” includes “any bank organized under the laws of the United States[.]” 12 U.S.C. § 25b(a)(1)(A). Defendant Midland Loan Services is, by its name, a division of PNC Bank. *See, e.g.*, Milbrandt Decl. ¶ 1, ECF No. 175; Watnick Decl. Supp. Defs.’ Reply Ex. 57, at 1, ECF No. 185; *see, e.g.*, *In re Hollingworth*, 453 B.R. 32, (Bankr. D. Mass. 2011) (“Courts may take judicial notice that a bank is a national bank if the bank is described by name as a ‘national’ bank.”) (citing cases). The Court takes judicial notice under Fed. R. Evid. 201(b)(2)(d) that “Wilmington Trust, National Association” and “PNC Bank, National Association” are listed as national banks by the Office of the Comptroller of the Currency. *See* National Banks Active as of 7/31/2025, Office of the Comptroller of the Currency, *available at* https://www.occ.treas.gov/topics/charters-and-licensing/financial-institution-lists/national-by-name.pdf. Both Defendant Trust and Midland are thus national banks governed by the NBA.

The National Bank Act establishes national banks' express and incidental powers, allowing them to "make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate," and exercise "all such incidental powers as shall be necessary to carry on the business of banking[,] by discounting and negotiating promissory notes[.]" 12 U.S.C. §§ 24, 371. The Ninth Circuit has held that the statute's text of "incidental powers" sweeps broadly, including powers "that are convenient or useful in connection with the performance of one of the bank's established activities," as well as those "closely related to banking and useful in carrying out the business of banking." *Bank of Am. v. San Francisco*, 309 F.3d 551, 562 (9th Cir. 2002) (internal quotation marks and citation omitted). In *Bank of America v. San Francisco*, the Ninth Circuit held that charging ATM fees was part of national banks' incidental powers and thus the NBA preempted city ordinances that prohibited institutions from charging ATM fees to non-depositors. 309 F.3d at 563.

The Office of the Comptroller of the Currency ("OCC") issues regulations and guidance under the NBA. *See generally Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 640 (D.C. Cir. 2000). Courts give "great weight" to the OCC's reasonable construction of the NBA. *See Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 403 (1987). OCC regulations provide that national banks may "make real estate loans" without regard to "state law limitations concerning . . . the circumstances under which a loan may be called due and payable . . . [or] [p]rocessing, origination, servicing, sale or purchase of, or investment or participation in, mortgages." 12 C.F.R. §§ 34.4(a)(4), (10).

The OCC also provided guidance for states and national banks concerning COVID foreclosure moratoriums. *See* OCC Bulletin 2020-62, OFFICE OF THE COMPTROLLER OF THE CURRENCY (June 17, 2020), *available at* https://www.occ.gov/news-

issuances/bulletins/2020/bulletin-2020-62.html. There, the OCC "recognize[d] the importance of prudent and proactive efforts to assist individuals affected by the COVID-19 emergency" and "strongly encouraged banks to work with affected customers." *Id.* The OCC highlighted the federal Coronavirus Aid, Relief, and Economic Security (CARES) Act that addressed forbearance on federally backed mortgage loans. The OCC noted that state and local laws establishing foreclosure moratoriums were "well-intended," but that "the OCC [was] concerned that the proliferation of a multitude of competing requirements [would] conflict with banks' ability to operate effectively and efficiently, potentially increasing the risk to banks' safety and soundness and ultimately harming consumers. In light of this concern, the OCC remind[ed] stakeholders that banks are governed primarily by uniform federal standards and generally are not subject to state law limitations." *Id.*

In light of those standards, the Court finds that the National Bank Act preempts HB 4204 because the Oregon law "prevents or significantly interferes with the" exercise of Defendants' powers granted by the NBA. *Cantero*, 602 U.S. at 220. The Court agrees with Defendants that servicing a loan, monitoring payments, and declaring default under the terms of a loan agreement are among the powers granted to national banks under the NBA. It is difficult to imagine more of an interference with a bank's powers than a prohibition on declaring default when a borrower stops paying. Declaring default according to the terms of a loan agreement is an authority much more "closely related to" and "useful in carrying out the business of banking" than the ATM fees that were held to be an incidental power in *Bank of America v. San Francisco*. This reasoning also comports with the Supreme Court's recent guidance in *Cantero*, 602 U.S. at 214–220 (discussing various state laws that did or did not "substantially interfere" with the NBA and directing courts to "make a practical assessment of the nature and degree of the interference caused by a state law").

Accordingly, HB 4204 was preempted by the National Bank Act and did not prohibit Defendants from declaring default in 2020.

### b. **Breaches of the Loan Agreement**

The parties move for summary judgment on their breach of contract claims. Under New York law,[1] a party alleging breach of contract must prove "(1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting form that breach." *National Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (citation omitted).

First, the parties dispute whether Plaintiff breached the Loan Agreement by failing to make timely payments in 2020, or whether Defendants breached the Loan Agreement by declaring default after Plaintiff failed to pay. Plaintiff does not dispute that it failed to make payments in May through October of 2020, constituting an "Event of Default" under Section 10.1(a)(i) of the Loan Agreement. *See* Watnick MSJ Decl. Ex. 4, at 74 (providing that an "Event of Default" occurs "if any monthly installment . . . is not paid when due"). Plaintiff's failure to make payments breached its obligations under the Loan Agreement.

Because Plaintiff failed to make payments during those months, and HB 4204 did not apply, Defendants' October 7, 2020 letter notifying Plaintiff that "the Loan ha[d] been accelerated and all amounts under the Loan Documents [were then] due and payable" was valid. Watnick MSJ Decl. Ex. 28, at 1–2; *id.* at Ex. 4, at 77 (providing that "[u]pon the occurrence of an Event of Default . . . Lender may . . . declar[e] the Obligations to be immediately due and payable"). Accordingly, Plaintiff's claim that Defendants breached the Loan Agreement by declaring default is DISMISSED, and Defendants' Motion for Summary Judgment on its claim that Plaintiff

---

[1] The Loan Agreement provides that New York law applies to "matters of construction, validity, and performance," while Oregon law applies to "provisions for the creation, perfection and enforcement of the lien and security interest created pursuant to the loan documents[.]" McKee MSJ Decl. Ex. A, at 80. The Court construes the parties' claims as challenging the performance of the Agreement and thus applies New York law.

breached the Loan Agreement by failing to pay is GRANTED. Plaintiff's Motion is DENIED as to those claims.

Second, Plaintiff alleges that Defendants breached the Loan Agreement by making an erroneous payment to "Marsh USA" in October of 2020. Plaintiff argues that under Section 11.12 of the Loan Agreement, CH is entitled to seek specific performance because the "Lender or its agents have acted unreasonably or unreasonably delayed acting[.]" McKee MSJ Decl. Ex. A, at 84. CH may seek a monetary judgment only if it is determined "that Lender acted with gross negligence, bad faith or willful misconduct." *Id.*

Plaintiff submits evidence that on October 9, 2020, a $90,873.32 payment was made from CH's reserves to Marsh USA, who Plaintiff argues "was *not* the broker or insurer for the CH Property[.]" Pl.'s Mot. 11 (emphasis in original); McKee MSJ Decl. 6, Ex. O, at 2. Plaintiff also submits evidence that Mr. McKee "made repeated requests to Midland as well as the master servicer, Wells Fargo," but despite those communications, "[t]hat $90,873.32 has never been credited back to CH[.]" McKee Decl. Supp. Pl.'s Mot. 6; *id.* at Exs. Q–S (email communications from McKee to Welek and Wells Fargo in July, September, and October of 2021).

Defendants submit evidence that the Loan's master servicer, Wells Fargo, made the allegedly incorrect payment, and Midland would have authorized it after it was made. Milbrandt Decl. Supp. Defs.' Opp. Pl.'s Mot. 2, ECF No. 178 ("That payment [to Marsh USA] was made by the master servicer for this loan, Wells Fargo, and Midland has no knowledge as to whether there was anything erroneous about the payment."); Watnick Decl. Supp. Defs.' Opp. Pl.'s Mot. Ex. 54, at 3 (Welek describing that the types of payment at issue "were generally made by the master servicer," Wells Fargo, and that "[he] would have authorized [the payment,] but . . . Wells [Fargo] would have paid whatever carrier [CH] had on file," and he doesn't know if the change in insurers

was communicated to them or not). Other evidence also indicates that the allegedly mistaken payment was being handled by Marsh USA and Wells Fargo, not any of the parties to this litigation. *See* McKee Decl. Supp. Pl.'s Reply Ex. EE, ECF No. 193.

The evidence before the Court shows only that a $90,873.32 payment was made to Marsh USA, that Mr. McKee contested that payment, and the payment was not credited back to CH. That evidence is insufficient to establish as a matter of law that Defendants are responsible for the mistaken payment, much less whether it was a breach of the Loan Agreement or otherwise unlawful. *See Bohmker v. Oregon*, 903 F.3d 1029, 1044 (9th Cir. 2018) (noting that a statement that reflects a "sincere personal opinion" may be "wholly lacking in the specific factual support that would be needed to create a genuine issue of material fact") (citation omitted). Both parties' Motions are DENIED as to this claim.

Third, Plaintiff argues that Defendants breached Section 11.12 by collecting "overpayments" of $1.2 million from Plaintiff and using those funds to pay Defendants' attorneys' fees rather than applying the funds to the loan. But Plaintiff was in default and owed Defendants the entire amount remaining under the Loan, so it could not have overpaid. Additionally, Defendants' use of funds paid by CH comports with Section 11.13 of the Loan Agreement, which requires CH to pay or reimburse the Lender for "reasonable actual attorneys' fees" that are "incurred . . . in connection with . . . [the parties'] ongoing performance of and compliance with" the Loan Agreement. Watnick MSJ Decl. Ex. 4, at 84. CH would not be liable if the Court determined that these claims "ar[o]se by reason of the gross negligence, illegal acts, fraud or willful misconduct of the Lender[.]" *Id.* Otherwise, "costs due and payable to Lender may be paid, at Lender's election in its sole discretion, from any amounts in the Cash Management Account." *Id.*

The Court finds no "gross negligence, illegal acts, fraud or willful misconduct" by Defendants at this stage. Because Plaintiff's claim about the allegedly unlawful payment to Marsh USA survives, however, Plaintiff may still be able to show that some of these claims arose from the "illegal acts" surrounding that payment. The parties' Motions are DENIED as to this claim.

Fourth, Plaintiff alleges that Defendants breached the Loan Agreement by acting in bad faith. Plaintiff points to the same conduct that supports its good faith and fair dealing claim to argue for this breach, but as discussed below, Plaintiff has not established that Defendants acted in bad faith. This claim is DISMISSED.

### c. Breaches of Good Faith and Fair Dealing

Plaintiff alleges that Defendants breached the covenant of good faith and fair dealing in several ways.

"Under New York law, a duty of good faith and fair dealing is implied in every contract." *Nat'l Market Share, Inc.*, 392 F.3d at 525 (internal citation omitted). The duty extends to "any promises which a reasonable person in the position of the promise would be justified in understanding were included [in the contract]." *Id.* (internal quotation marks and citation omitted). The covenant of good faith and fair dealing means that "neither party shall do anything which shall have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educational Testing Serv.*, 87 N.Y.2d 384, 389 (N.Y. Ct. App. 1995) (internal quotation marks and citation omitted). "No obligation can be implied, however, which would be inconsistent with other terms of the contractual relationship." *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (N.Y. Ct. App. 1983). Plaintiff "bears a heavy burden" in bringing this claim because it must prove "that the particular unexpressed promise sought to be enforced is in fact

implicit in the agreement viewed as a whole." *Filmore East BS Fin. Subsidiary LLC v. Capmark Bank*, 2013 WL 1294519, at *12 (S.D.N.Y. Mar. 30, 2013).

Some of Plaintiff's allegations are duplicative of its breach of contract claim and must be DISMISSED at the outset. *See, e.g.*, *Mill Fin., LLC v. Gillett*, 122 A.D.3d 98, 104, 992 N.Y.S.2d 20 (N.Y. App. Div. 2014) ("Where a good faith claim arises from the same facts and seeks the same damages as a breach of contract claim, it should be dismissed.") (citations omitted). The good faith and fair dealing claims that are entitled to consideration are Plaintiff's arguments that Defendants breached by violating industry standards in refusing to grant relief during the pandemic and by misrepresenting the status of communications between CH and Midland.

First, Plaintiff argues that Defendants' failure to provide relief during the pandemic violated good faith and fair dealing because "the [p]andemic's effect on the CMBS special servicing standards had the effect of modifying the parties' reasonable expectations of their contractual relationship[.]" Pl.'s Mot. Summ. J. 21 Industry standards may be considered when determining whether a party breached the covenant of good faith and fair dealing. *See, e.g.*, *U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins.*, 112 F. Supp. 3d 122, 135–36 (S.D.N.Y. 2015) ("Industry practices and standards are relevant to [a good faith and fair dealing] claim insofar as they may inform what a reasonable [party] would expect under a contract.").

The parties dispute what the industry standard was at the time. Plaintiff argues that the parties' expectation and industry standard in May of 2020 was for lenders to use reserve funds for debt service payments and waive default interest, late fees, and loan covenants that were triggered as a result of a borrower's lost income. Pl.'s Mot. Summ. J. 5–6 (citing Hambly Decl. Ex. A, at 10, ECF No. 144). Plaintiff argues that the standard later evolved to include deferral of up to 12 months of payments. *Id.* at 6.

Defendants offer evidence that it was "standard practice" to "dual track" foreclosure and modification discussions by "start[ing] the foreclosure process" during negotiations with the borrower. Watnick MSJ Decl. Ex. 45, at 81:20–82:13. Notably, Plaintiff's own expert publicly stated in October of 2020 that "[t]here [were] no standard [pandemic-relief] packages being offered," rather, there were at least three different courses of action available. *Id.* at Ex. 52, at 1. Plaintiff's expert testified that as many as 100 Oregon loans did not receive any relief like that provided in HB 4204. *Id.* at Ex. 45, at 97:7–104:12. And as discussed above, Defendants attempted for some time to negotiate a modification with Plaintiff before initiating foreclosure proceedings.

Accordingly, Plaintiff's evidence about what may have been a common course of conduct during the pandemic does not establish that Defendants acted unlawfully by not following that course of conduct. *See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007) (noting a "presumption" of good faith). To the contrary, Defendant have proven that industry standards varied such that there was no breach of any "unexpressed promise . . . implicit in the agreement viewed as a whole." *Filmore East BS Fin. Subsidiary LLC*, 2013 WL 1294519, at *12; *see also Eastern Savings Bank v. Aufiero*, 2016 WL 1056998, at *9 (E.D.N.Y. Mar. 14, 2016) (dismissing good faith and fair dealing claim based on lender's failure to modify the loan because "there was no binding loan modification agreement or obligation to provide" a modification). Further, prohibiting Defendants from declaring default based on some purported industry standard would contradict the express terms of the contract, which is not permitted. *See Fesseha v. TD Waterhouse Investor Servs., Inc.*, 761 N.Y.S.2d 22, 23 (N.Y. App. Div. 2003) ("While the covenant of good faith and fair dealing is implicit in every contract, it cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create

independent contractual rights."). Accordingly, there is no genuine dispute that Defendants did not breach good faith and fair dealing in this way, so this claim is DISMISSED.

Second, Plaintiff alleges a breach of good faith and fair dealing based on misrepresentations Welek (of Midland) made to KKR in March and July of 2021, stating that CH was not communicating with Midland when in fact CH had sent modification proposals and awaiting a response from Midland. Plaintiff submits evidence that Welek told KKR that Midland was "[c]ontinuing with foreclosure," CH had "reached out on possible modification . . . but ha[d] yet to supply any structure to a modification request," and that CH "[h]a[d] not gotten back to [him]" about a possible forbearance. Schleicher MSJ Decl. Ex. 6, at 2–5. Welek confirmed that some of those details were inaccurate, and suspected that he was mixed up about which deal he was discussing. *See id.* Plaintiff submits evidence that relating inaccurate information does not meet industry servicing standards. Pl.'s Mot. Summ. J. 19 (citing Schleicher Decl. Ex. 5, at 85:8–87:5, 103:2–7, 114:5–25, 115:2–11, 121:5–122:17, 127:5–128:25, 129:5–9; *id.* at Ex. 2, at 113:16–22 (expectation is that correct information is provided to the DCH); Hambly Decl., Ex. A, at 11–18 (explaining how Defendants failed to comply with the servicing standards in the CMBS industry)).

For their part, Defendants submit evidence that special servicers like Midland were facing an "onslaught of loans" and "abrupt changes" during the pandemic. Watnick MSJ Decl. Ex. 53, at 2. Servicers were "overwhelmed" because the "large amount of [CMBS] loans that needed to get transferred to special servicing all at once" was unprecedented, and servicers "weren't staffed to handle this immediate onslaught." *Id.* at Ex. 45, at 44:20–25, 45:6–22.

This is sufficient evidence for the Court to conclude that Welek's misstatement was at most negligent and does not rise to the level of bad faith that Plaintiff alleges. *See Sec. Plans, Inc. v.*

*CUNA Mut. Ins. Soc.*, 769 F.3d 807, 817 (2d Cir. 2014) (showing of bad faith requires "substantially more than evidence that the defendant's actions were negligent or inept"); *Najjar Grp., LLC v. W. 56th Hotel LLC*, 850 F.App'x 69, 72 (2d Cir. 2021) (citation omitted) (bad faith looks to whether the lender "exercise[d] its discretion malevolently, for its own gain as part of a purposeful scheme designed to deprive [the borrower] of the benefits of a contract"). This claim is also DISMISSED.

### d. **Conversion**

Plaintiff's claims for conversion are predicated on allegations that Defendants misapplied payments under the Loan Agreement, which is fundamentally a challenge of Defendants' performance of the contract. Plaintiff's allegations are thus "fundamentally a contractual issue and not a conversion claim." *Wood v. Nationstar Mortgage, LLC*, No. 16-2061, 2017 WL 3484664, at *9 (D. Or. Aug. 14. 2017) (McShane, J.) ("The only money allegedly converted was late fees charged under the Note. While Plaintiff may dispute the delinquency, this is fundamentally a contractual issue and not a conversion claim."); *see also Fesseha v. TD Waterhouse Investor Servs., Inc.*, 761 N.Y.S.2d 22, 24 (N.Y. App. Div. 2003) ("A cause of action for conversion cannot be predicated on a mere breach of contract."); *Graham v. Portfolio Servicing, Inc.*, 156 F. Supp. 3d 491, 512–13 (S.D.N.Y. 2016 (dismissing conversion claim against lender and servicer that "merely s[ought] to enforce" the loan agreement). Plaintiff's conversion claims are DISMISSED.

### e. **Declaratory Judgment**

Finally, Plaintiff moves for a declaratory judgment. Because the above claims are dismissed, the only remaining issue is Plaintiff's request that the Court declare that the fees Defendants charged were unenforceable penalties that may not be imposed.

A damages clause is unenforceable as violative of public policy when it serves not to compensate the injured party for the breach, but to "impose a penalty on the breaching party by requiring payment of a sum of money grossly disproportionate to the amount of actual damages." *LG Capital Funding, LLC v. FLASR, Inc.*, 422 F. Supp. 3d 611, 626 (E.D.N.Y. 2018). But it is "well settled that an agreement to pay interest at a higher rate in the event of default or maturity is an agreement to pay interest and not a penalty." *Jamaica Savings Bank, F.S.B. v. Ascot Owners*, 245 A.D.2d 20, 20 (N.Y. App. Div. 1997); *see also Wilmington Tr. v. Winta Asset Mgmt. LLC*, 2023 WL 9603893, at *5 (S.D.N.Y. Dec. 21, 2023), *report and recommendation adopted*, 2024 WL 1700032 (S.D.N.Y. Apr. 18, 2024). Accordingly, courts regularly enforce default interest provisions providing for higher than usual rates. *See, e.g.*, *LG Capital Funding, LLC v. Solar Energy Initiatives, Inc.*, 2019 WL 7630792, at *4 (E.D.N.Y. Nov. 1, 2019) (collecting cases and allowing a 22% interest rate); *see also LG Capital Funding, LLC v. FLASR, Inc.*, 422 F. Supp. 3d 611, 625 (E.D.N.Y. 2018).

Plaintiff argues that "the default interest and late charge provisions and workout fee are entirely unrelated to the actual damages that the parties could have anticipated would flow from any alleged breaches." Pl.'s Mot. Summ. J. 28. Plaintiff contends that the "Default Rate," "Late Payment Charge" and workout fees provided for in the Loan Agreement constitute additional compensation beyond what is needed to repay Defendants for damages they incurred because of Plaintiff's breach.

Here, the default interest rate is "the lesser of (i) the Maximum Legal Rate or (ii) five percent (5%) above the Interest Rate." Watnick MSJ Decl. Ex. 4, at 103. The "Maximum Legal Rate" means the "maximum nonusurious interest rate," and the "Interest Rate" is 4.55%. *Id.* at 107, 110. Accordingly, the default interest rate is, at most, 9.55%. As mentioned above, New York

courts have allowed for charges at double that rate. Plaintiff does not meaningfully contest that law. Further, Plaintiff does not attempt to establish what injuries Defendants actually suffered to allow the Court to determine whether the charges are "grossly disproportionate to the amount of actual damages." *See Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.*, 310 F. Supp. 2d 556, 566 (S.D.N.Y. 2003) (internal quotation marks omitted). Both parties' Motions for Summary Judgment are DENIED as to this claim.

## III. Plaintiff's Motion for Summary Judgment

Plaintiff also moves for summary judgment against Defendants' claim for breach of guaranty against Lawson in the Trust Complaint. Plaintiff argues that Lawson cannot be liable for breach of guaranty because there was no default by CH and Defendants may not enforce the contract that they materially breached. But as discussed above, Plaintiff's arguments lack merit. Plaintiff's Motion is DENIED as to the Trust Complaint.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment, ECF No. 139, is GRANTED in part and DENIED in part, and Plaintiff's Motion for Summary Judgment, ECF No. 143, is DENIED. Plaintiff's Motion for Sanctions, ECF No. 149, is DENIED.

IT IS SO ORDERED.

DATED this 3rd day of September 2025.

s/Michael J. McShane_____
Michael McShane
United States District Judge