IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

CORVALLIS HOSPITALITY, LLC, *an Oregon limited liability company*

              Plaintiff,

    v.

WILMINGTON TRUST, NATIONAL ASSOCIATION *as Trustee for the Benefit of the Holders of LCCM 2017-LC26 Mortgage Trust Commercial Mortgage Pass-Through Certificates, Series 2017-LC26*; MIDLAND LOAN SERVICES, INC., *a Delaware corporation*; BEACON DEFAULT MANAGEMENT, INC., *a California corporation*; and K-STAR ASSET MANAGEMENT, LLC, *a Delaware limited liability company*,

              Defendants.

Case No. 6:22-cv-00024-MC, Lead Case

Case No. 6:22-cv-00993-MC, Consolidated Case

OPINION AND ORDER

MCSHANE, Judge:

Plaintiff Corvallis Hospitality, LLC ("CH") took out an $18 million loan backed and serviced by Defendants.[1] After protracted litigation, this Court found CH breached its obligations under the Loan Agreement. *See* Sep. 11, 2025, Am. Op. & Order 13, ECF No. 201. On account of Plaintiff's breach, Defendants ask this Court to declare what CH owes them according to the terms

---

[1] Defendant Wilmington Trust is Plaintiff in Consolidated Case *Wilmington Trust*, *National Association v. Lawson*, No. 6:22-cv-00993-MC. All ECF citations in this Opinion refer to the Docket in the Lead Case, *Corvallis Hospitality, LLC v. Wilmington Trust, National Association et al.*, No. 6:22-cv-00024-MC. Accordingly, the Court refers to CH as "Plaintiff" and Defendants in the Lead case as "Defendants."

1 – Opinion and Order

of the Loan Agreement. Defs.' Mot. for J. & Relief 1, ECF No. 217.

Based on the reasons set forth in this Opinion, Defendants' Motion for Relief and Entry of Judgment is **GRANTED** in part and **DENIED** in part.

## BACKGROUND

### I.    Brief recitation of facts.

The facts giving rise to Plaintiff's claims are well-documented. What follows is a brief refresher on key facts.

Plaintiff CH owns and operates the Hilton Garden Inn Corvallis. Second Am. Compl. ("SAC") ¶ 1, ECF No. 126. CH took out a loan in 2017, evidenced by a promissory note for the principal amount of $18,000,000. McKee MSJ Decl. ¶ 4, ECF 158.

During the COVID-19 pandemic, CH did not make loan payments from May through October 2020. McKee MSJ Decl. Ex. L, at 1–2. Defendant Wilmington, through outside counsel, notified CH that the Loan was in default on account of the missed payments. *Id.* Wilmington then accelerated the Loan, rendering all outstanding amounts then due and payable. *Id.*

CH looked to Oregon House Bill ("H.B.") 4204 for reprieve. *See* Sep. 11, 2025, Am. Op. & Order 1. The Bill created a COVID-19 emergency period during which an eligible borrower could defer loan payments until maturity and pay no interest or fees. H.B. 4204 §§ 1(2)(b), (3)(a). It also prohibited lenders declaring default, imposing penalties, or foreclosing properties because borrowers missed payments during the emergency period. H.B. 4204 § 1(3)(a).

Contrary to CH's contentions, H.B. 4204 did not prevent Defendants from declaring the Loan in default because this Court found that the National Banking Act preempts H.B. 4204. Sep. 11, 2025, Am. Op. & Order 13. Because CH failed to make payments in May through October 2020 and H.B. 4204 was preempted, CH breached the Loan Agreement. *Id.*

This Court's finding that CH breached its obligations under the Loan Agreement underlies

Defendants' instant Motion for Relief and Entry of Judgment. *See* Defs.' Mot. for J. & Relief. As CH was in breach, Defendants seek amounts owed pursuant to the Loan, including attorney fees and costs. *Id.* 6.

## II.     Prior proceedings and remaining issues.

The protracted procedural history in this case bears on Defendants' accounting of considerable attorney fees and costs. Appendix A details the phases of litigation.

To summarize, there are three remaining issues after summary judgment: (1) CH's claim that Defendants breached the Loan Agreement by authorizing a payment to "Marsh USA" in October 2020[2]; relatedly, CH's claims regarding any attorney fees and costs arising from the erroneous "Marsh USA" payment; (2) CH's request for declaratory judgment that the fees arising from CH's default are unenforceable penalties; and (3) Defendant Wilmington's claims that it can recover from Lawson as Guarantor. Sep. 11, 2025, Am. Op. & Order 22–23.

Relevant now, the Court found CH liable for breaching the Loan Agreement by failing to make payments from May to October 2020. *Id.* 13–14. Defendants accordingly ask the Court to issue an Order that: (1) provides that the amount due and owing to Defendants, as of October 5, 2025, is at least $24,058,201.29 (Defendants request to update the amount after the May 28, 2026, hearing before this Court); (2) sets a date for Defendants to file a proposed judgment reflecting additional amounts due since October 5, 2025, with a deadline for CH and Lawson to file objections; and (3) sets a date for Defendants to file a proposed judgment of foreclosure and sale if CH and Lawson do not satisfy the judgment requested here. Defs.' Mot. for J. & Relief 24–25.

## LEGAL STANDARD

This Court has discretion at this juncture to adjudicate the reasonableness of Defendants'

---

[2] The parties agree the Loan's master servicer mistakenly made an insurance payment from of approximately $90,000 from Plaintiff CH's funds to recipient "Marsh USA." Defs.' Mot. for J. & Relief 5; Pl.'s Resp. in Opp'n 3.

requested fees. *E.g., H. Naito Corp. v. Quest Ent. Ventures, L.P.*, No. Civ. 00-506-AS, 2001 WL 34041860, at *1, *4 (D. Or. Jul. 2, 2001) (granting plaintiff's motion for relief after concluding at the summary judgment stage defendants breached their lease); *see also Wilmington Tr., Nat'l Ass'n v. Winta Asset Mgmt. LLC*, 20-CV-5309 (JGK) (VF), 2023 WL 9603893, at *2, *9 (S.D.N.Y. Dec. 21, 2023) (awarding final judgment under loan agreement after finding borrower defaulted), *R. & R. adopted in full*, 2024 WL 1700032.

## DISCUSSION

### I.    Plaintiff's breach of contract claim arising from the "Marsh USA" payment is moot.

The first issue is whether mootness applies to CH's claim that Defendants wrongfully authorized an insurance payment from Wells Fargo, the Loan's Special Servicer, to "Marsh USA" in October 2020. Defs.' Mot. for J. & Relief 7; Pl.'s Resp. in Opp'n 48, ECF No. 228. At summary judgment, this Court denied both parties' Motions for Summary Judgment relating to this claim. Sep. 11, 2025, Am. Op. & Order 15. The evidence before the Court was insufficient to establish that Defendants "are responsible for the mistaken payment" and that the payment breached the Loan Agreement. *Id.*

Defendants now argue this claim is moot because the contested payment of $90,873.32 was refunded to CH in June 2025. Defs.' Mot. for J. & Relief 7 (citing Furay Decl. ¶¶ 53–54, ECF No. 219). CH counters the refund has not ameliorated the effect of the "wrongful payment." Pl.'s Resp. in Opp'n 49. At the very least, according to CH, there are triable issues of fact as to whether Defendants acted unreasonably in refunding the insurance payment, without interest, five years after it was made. *Id.* 48.

A claim is moot when the issues "are no longer live or the parties lack a legally cognizable interest in the outcome." *Comer v. Cisneros*, 37 F.3d 775, 798 (2d Cir. 1994) (quoting *Cnty. of*

*L.A. v. Davis*, 440 U.S. 625, 631 (1979)). Courts have found breach of contract claims moot when defendants tender refunds that furnish plaintiffs complete relief. *Cf. Sholopa v. Turk Hava Yollari A.O., Inc.*, 595 F.Supp.3d 257, 262 (S.D.N.Y. 2022) (holding plaintiff's claim is not moot because the refund of her ticket price did not fully compensate her). A plaintiff who is fully compensated by a refund during litigation cannot prove the damages element of his contract claim. *See, e.g., Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (under New York law,[3] to state a claim for breach of contract, a plaintiff must show that: a contract existed; the plaintiff performed; the defendant breached; and the plaintiff sustained damages attributable to the breach).

What remains of CH's breach of contract claim arising from the wrongful insurance payment tendered to "Marsh USA" is moot. Nearly a year ago, CH received a full refund of the contested insurance payment via credit to the Loan's suspense account. Furay Decl. ¶ 54; *id.* Ex. 14. In *Doyle v. Midland Credit Management, Inc.*, the Second Circuit affirmed the district court's dismissal of a plaintiff's claim for mootness when he refused to settle for the full amount in question. 722 F.3d 78, 81 (2d Cir. 2013). There, the plaintiff acknowledged that he was not entitled to more in damages than what the defendant offered in settlement. *Id.* Here, on the other hand, CH demands more than a full refund of the wrongful payment. Pl.'s Resp. in Opp'n 49. But CH fails to establish that this refund does not put CH in the same position as if the payment had never issued.

CH unconvincingly argues mootness does not apply, maintaining the refund does not eradicate the effects of the initial payment. Pl.'s Resp. in Opp'n 49; *see also, e.g., Ostenfeld v. Laundress, LLC*, 22-CV-10667 (JMF), 2024 WL 967124, at *6–7 (S.D.N.Y. Mar. 5, 2024)

---

[3] The Loan Agreement provides that New York law governs construction, validity, and performance. *See* Sep. 11, 2025, Am. Op. & Order 13 n.3. The Court construes CH's breach of contract claim as one challenging performance. *Id.*; *see also* Defs.' Mot. for J. & Relief 9 n.6.

(holding class plaintiffs' claims are not moot because defendant cannot show that plaintiffs participated in the recall program and obtained a refund). The effects purportedly persist because the refund was a credit back to the Loan's suspense account, there was a five-year delay in the refund, and the refund was without interest. Pl.'s Resp. in Opp'n 49. But CH does not explain why a credit back to the suspense account and the five-year delay warrant damages beyond the full payment amount.

As for interest, Defendants clarify the contested payment issued from an insurance escrow account and thus did not accrue interest. Defs.' Reply 10, ECF No. 236 (citing Furay Reply Decl. ¶ 19, ECF No. 238). CH does not argue otherwise. CH proclaims a credit refund without interest renders its contract claim live, yet there is no mention of interest rate or the exact damages CH seeks. Pl.'s Resp. in Opp'n 49–50. New York law requires that damages arising from contract claims must be "*reasonably certain* and such only as actually follow or may follow from the breach of the contract." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (citation omitted). A vague reference to interest on the wrongful payment does not satisfy.

Finally, CH maintains entitlement of monetary damages arising from Defendants' gross negligence, bad faith, or willful misconduct.[4] Pl.'s Resp. in Opp'n 50; *see also* Furay Decl. Ex. 1, at 84 (Section 11.13 of the Loan Agreement, providing that "Borrower shall not be liable for . . . any such costs and expenses" arising from "gross negligence, illegal acts, fraud or willful misconduct of the Lender."). At the very least, argues CH, a jury should determine whether Defendants acted unreasonably and with gross negligence. Pl.'s Resp. in Opp'n 50. This Court disagrees. CH proffers no specific evidence that Defendants acted in bad faith, just that they

---

[4] In its Amended Order and Opinion at the summary judgment stage, this Court left open the possibility that CH could show that the "Marsh USA" payment stemmed from "gross negligence, illegal acts, fraud or willful misconduct." Sep. 11, 2025, Am. Op. & Order 16. As explained above, CH did not make this showing.

negligently failed to issue a credit refund until June 2025. *Id.* 49. Nothing remains of CH's breach of contract claim.

## II.    <u>CH owes outstanding principal, interest, and related payments because it defaulted on the Loan.</u>

This Court already found that CH's failure to pay from May through October 2020 breached the Loan Agreement. Sep. 11, 2025, Am. Op. & Order 14. The Court then denied both parties' Motions for Summary Judgment as to CH's claim that the resulting fees and default interest constitute unenforceable penalties. *Id.* 21–22. In their instant Motion, Defendants ask this Court to require CH to pay outstanding amounts under the Loan Agreement. Defs.' Mot. for J. & Relief 7. Specifically, Defendants request: (1) the outstanding principal balance on the Loan; (2) default interest; (3) late fees; (4) expenses; (5) a yield maintenance premium; (6) special servicing fees; (7) workout fees; and (8) interest on advances. *Id.* 9.

As this Court found an "Event of Default" under Section 10.1(a)(i) of the Loan Agreement, Defendants can sue for the full amount owed[5]—an amount validated by the Court. Sep. 11, 2025, Am. Op. & Order 13; *see also Capstone Cap. Grp., LLC v. Hahn*, 21-CV-1636 (PGG) (KHP), 2022 WL 2532449, at *5 (S.D.N.Y. Mar. 15, 2022) (looking to papers provided by plaintiffs in calculating the amounts owed by defaulting defendants); *CIT Bank, N.A. v. Elliot*, CV 15-4395 (JS) (ARL), 2019 WL 5694332, at *2 (E.D.N.Y. Jul. 25, 2019) (citation omitted) (in a foreclosure action, damages calculated per the terms of the loan).

CH challenges Defendants' instant Motion as "procedurally improper." Pl.'s Resp. in Opp'n 5. That cricket won't sing. The Court expressly authorized this round of motion practice at

---

[5] The Loan Agreement provides that the law of the state where the property is located—Oregon—governs enforcement of the lien and security interest. Furay Decl. Ex. 1, at 80 (Section 11.3(a) of the Loan Agreement). Under Oregon law, when a debtor defaults, the lender may "sue on the note and obtain a personal judgment against the debtor in the full amount of the debt." *E.g., Memmott v. OneWest Bank*, Civil No. 10-3042-CL, 2011 WL 1560985, at *11 (D. Or. Feb. 9, 2011).

a status conference on January 5, 2026. *See* Jan. 5, 2026, Hr'g Tr. 8:20–24, 12:12–13:15, ECF No. 216. Still, CH moved to schedule a trial, stating this Court lacks authority to "refuse to set a trial date after the denial of summary judgment." Pl.'s Status Rep. 3–4, ECF No. 222. The Court did not explicitly deny CH's request, but instead scheduled oral argument for Defendant's instant Motion according to the January 5, 2026, hearing. *See* Feb. 9, 2026, Order, ECF No. 224. This is well within the Court's authority. *E.g., Fed. Deposit Ins. Corp. v. Glickman*, 450 F.2d 416, 419 (9th Cir. 1971) (a district judge has broad discretion in handling the pre-trial phase of litigation and should only send to trial "honest disputes of fact or law."). Since Defendants' Motion for Relief and Entry of Judgment is procedurally proper, the Court proceeds to analyze the reasonableness of each payment Defendants seek.

CH challenges each fee category separately. *See* Pl.'s Resp. in Opp'n. The Court ultimately concludes CH owes Defendants interest, fees, and costs as requested by their instant Motion. Appendix B steps through the Court's assessment of the various fee categories, including whether they are authorized under the Agreement and whether they are reasonable. The following Section analyzes only attorney fees and costs.

### III.    CH is liable for reasonable, actual attorney fees and costs.

#### a.    CH owes attorney fees and costs under the Loan Agreement.

The first issue is whether CH is liable for reasonable, actual attorney fees and costs associated with enforcing its Loan obligations. Section 11.13 obligates CH to broadly indemnify Defendants.[6] Furay Decl. Ex. 1, at 84 (Section 11.13 of the Loan Agreement). Defendants allege they are entitled to $3,742,854.27 in reasonable, actual attorney fees and $274,973.01 in costs.

---

[6] Section 11.13 requires CH to reimburse Defendants for fees associated with (among other things) "the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to the Loan Documents" and "enforcing any Obligations of or collecting any payments due" owed by CH. Furay Decl. Ex. 1, at 84.

Defs.' Mot. for J. & Relief 15.

CH argues Defendants' claim for attorney fees and costs under Section 11.13 must fail because the Loan Agreement "does not contain a 'fee-shifting' provision." Pl.'s Resp. in Opp'n 26–27. CH hangs its hat on the observation that "the term 'prevailing party' appears nowhere in the Loan Agreement." *Id.* 30. That is immaterial. Section 11.13 requires CH to pay or reimburse the Lender for attorney fees and costs connected to the parties' ongoing performance of the Loan Agreement. Furay Decl. Ex. 1, at 84. And this Court has already determined CH is liable for such fees, unless they stem from gross negligence, illegal acts, fraud, or willful misconduct. Sep. 11, 2025, Am. Op. & Order 15–16. The Court has seen no evidence of malfeasance and so this line of argument fails.

CH next urges this Court to invalidate the attorney fees and costs provision because Defendants paid $1.2 million dollars in attorney fees from a "suspense" account and not the "Cash Management Account." Pl.'s Resp. in Opp'n 34. The parties agree no Cash Management Account exists. *Id.*; Defs.' Reply 24. Yet Defendant alleges CH was responsible for creating the Account. Defs.' Reply 24 (citing Furay Reply Decl. ¶ 17 (quoting Ex. 16, at 2, § 1(a))). Even were that not true, the Court fails to see—and CH fails to illustrate—why disbursing funds from a suspense account matters.

The Court finds CH owes reasonable, actual attorney fees and costs pursuant to Section 11.13 of the Loan Agreement. *See, e.g., Winta Asset Mgmt. LLC*, 2023 WL 9603893, at *8 (citation omitted) (attorney fees recoverable in a mortgage foreclosure action if the mortgage document obligates the borrower to pay fees and expenses incurred in that action); *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008) (a contract under New York law that awards reasonable attorney fees to the prevailing party in an enforcement action is valid if the

language is sufficiently clear).

### b. Defendants' requested attorney fees and costs are reasonable.

Since the Court finds the attorney fees and costs provision in the Loan Agreement enforceable, the next question is whether Defendants' request for $3,742,854.27 is reasonable. *See* Defs.' Mot. for J. & Relief 15.

Under New York law, a court can enforce a contract's fee-shifting provision when the amounts are "not unreasonable." *Diamond D Enters. USA, Inc. v. Steinsvaag*, 979 F.2d 14, 19 (2d Cir. 1992) (citation omitted). Courts have broad discretion to approve an attorney fee award pursuant to a "valid contractual authorization." *U.S. Fid. and Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 74 (2d Cir. 2004) (citation omitted); *see also McGuire v. Rusell Miller, Inc.*, 1 F.3d 1306, 1313 (2d Cir. 1993) (if a contract provides for an award of attorney fees and costs, "such an award becomes the rule rather than the exception.").

The applicant must establish the fees and costs are reasonable by proffering documentation of time worked and hourly rates. *E.g., Wistron NeWeb Corp. v. Genesis Networks Telecom Servs., LLC*, 22-cv-2538 (LJL), 2023 WL 5211352, at *9 (S.D.N.Y. Aug. 14, 2023) (citation omitted). Courts assess reasonableness through a variety of factors, such as the complexity of the legal issues, the skills required, the time and labor expended, the customary fee charged in similar actions, and the lawyers' experience and reputation. *Id.*

As the instant Loan Agreement contains a valid fee-shifting provision, this Court need not scrutinize Defendants' billing records from stem to stern. *See Clarendon Nat'l Ins. Co. v. Advance Underwriting Managers Agency, Inc.*, No. 06 Civ. 15361(BSJ), 2011 WL 6153691, at *2 (S.D.N.Y. Dec. 8, 2011) (in determining a fee award based on a contractual fee provision, courts need "only make adjustments for any unnecessary, unreasonable, or excessive fees.").

### i. The number of hours Defendants spent on the case is reasonable.

Defendants seek fees for 4,224.40 hours of work during this litigation. Defs.' Mot. for J. & Relief 15. Defendants cite the complexity of this litigation, its extended discovery, and "involved motion practice" to support their estimate. *Id.* Defendants do not seek reimbursement for every hour expended on this litigation and have voluntarily reduced some fees. *Id.* 16. For instance, Defendants omit any time spent "regarding CH's now-mooted claim for breach of contract with respect to the Insurance payment." *Id.*

CH alleges Defendants' hours estimate is "highly excessive" and warrants a substantial reduction. Pl.'s Resp. in Opp'n 41 (citing O'Connor Decl. ¶ 118, ECF No. 232). CH states Defendants' estimated 4,224.40 hours of services totaling $3,742,854.27 is in addition to the $1,246,000.00 in attorney fees and costs that Defendants have already paid their counsel. Pl.'s Resp. in Opp'n 41 (citing O'Connor Decl. ¶¶ 25, 31). Defendants clarify the final fee request, including fees previously paid out of the suspense account, "will be reconciled" at a later date. Defs.' Reply 28 (citing Furay Decl. ¶ 31). As Defendants point out, CH objects to additional fees Defendants do not seek. Defs.' Reply 28.

CH also contrasts Defendants' hours estimate with its own, arguing Defendants billed nearly twice the number of hours. Pl.'s Resp. in Opp'n 42; *see also* O'Connor Decl. ¶¶ 34, 50. CH's beef with Defendants' estimate is that "Defendants' primary defense in this action is a legal one—whether HB 4204 is preempted by federal law." Pl.'s Resp. in Opp'n 42. CH's second major grievance stems from "Defendants' unjustified decision to retain Perkins Coie and Jenner & Block as litigation counsel" without demonstrating that Perkins Coie could not "effectively litigate this case through trial." *Id.* 46.

To establish an initial estimate of reasonable fees, courts multiply the number of hours

"reasonably expended" by a "reasonable hourly rate for attorneys and paraprofessionals." *E.g., Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992). Courts should inspect contemporaneous records of "work done and time spent" to assess a party's accounting of what they are owed. *E.g., In re Hudson & M.R. Co.*, 339 F.2d 114, 115 (2d Cir. 1964). Here, Defendants have submitted contemporaneous records of hours billed. *See* Ascher Decl., ECF No. 220 (records supporting Jenner & Block LLP's request for attorney fees and costs); Watnick Decl., ECF No. 218 (records supporting Perkins Coie LLP's request for attorney fees and costs).

### 1.  CH's litigation strategy.

The first consideration underlying Defendants' hours estimate is the nature of this litigation, which has been protracted, contentious, and characterized by thorny discovery. The Court also notes CH's obdurate tactics. For instance, CH moved unsuccessfully to remand the matter to state court. *See* Mot. to Remand, ECF No. 7; Jun. 6, 2022, Op. & Order ECF No. 16. And not long after, this Court granted Defendants' Motion for Judgment on the Pleadings. *See* Mot. for J. on the Pleadings, ECF No. 18; Oct. 18, 2022, Op. & Order, ECF No. 31. CH filed a First Amended Complaint, which this Court dismissed in part. *See* Am. Compl., ECF No. 32; Apr. 28, 2023, Op. & Order, ECF No. 58.

After the motion to dismiss phase, parties commenced a two-year discovery period riddled with disputes. CH moved (again, unsuccessfully) to extend discovery deadlines before the parties meaningfully conferred to develop mutually agreed upon deadlines. *See* Mot. for Ext. of Discovery; Nov. 22, 2023, Order, ECF No. 76. CH then moved to compel the production of privileged documents from a non-party at the time, which this Court denied. *See* Mot. to Compel, ECF No. 102; Dec. 2, 2024, Order, ECF No. 116.

CH sought leave to file a Second Amended Complaint, which this Court granted. *See* Mot.

for Leave to File Am. Compl.; Jan. 10, 2025, Order, ECF No. 124. But then a month later, ten days before summary judgment motions were due, CH moved to refer the case to a judicial settlement conference. Mot. for Referral to Judicial Settlement Conf., ECF No. 132. This Court denied the Motion. Mar. 6, 2025, Order, ECF No. 162.

In the middle of the lengthy summary judgment phase, CH moved for sanctions on account of alleged spoliation of evidence. Mot. for Sanctions, ECF No. 149. This Court denied CH's Motions for Sanctions in its Opinion resolving the parties' cross Motions for Summary Judgment. Sep. 11, 2025, Am. Op. & Order. CH asked this Court to reconsider its conclusions at summary judgment and moved to reopen discovery. Mot. for Recons., ECF No. 202. CH's Motion for Reconsideration was denied. Dec. 19, 2025, Order, ECF No. 213.

Undoubtedly all parties litigated this case vigorously. And "in litigating a matter, an attorney is in part reacting to forces beyond the attorney's control, particularly the conduct of opposing counsel and of the court." *Kassim v. City of Schenectady*, 415 F.3d 246, 252 (2d Cir. 2005). "[T]he hours required to litigate even a simple matter can expand enormously" when an attorney must "defend against frivolous motions" and brief discovery disputes more appropriate for a meet and confer. *Id.* CH contends it faced Defendants' "obstruction of access to discovery and spoliation" as well as their needless pursuit of third-party discovery. Pl.'s Resp. in Opp'n 42. Even so, according to CH, it billed half the hours Defendants did briefing those disputes. *Id.* But CH lost those battles, so it should not wave them around as evidence of relative efficiency.

And the number of hours CH billed does not necessarily bear on Defendants' estimate. *See, e.g., Bank of the West v. M/V NEVER SAY NEVER*, No. CV-05-6004 (FB)(SMG), 2008 WL 4159360, at *3 (E.D.N.Y. Sep. 9, 2008) (quoting *Ferland v. Conrad Credit Corp.*, 244 F.3d 1145, 1151 (9th Cir. 2001)) (opposing parties have different responsibilities, so comparing hours spent

13 – Opinion and Order

by the party seeking fees and the party opposing them may not indicate whether the hours expended by the former were "excessive."). Defendants allege discovery was "asymmetrical" in this case, with Defendants producing "the vast majority of documents in the litigation." Defs.' Reply 28 (citing Watnick Reply Decl. ¶ 4, ECF No. 237). Defendants also note—and this Court agrees—that their motion practice was successful on the whole, unlike CH's. *See Ursa Minor Ltd. v. Aon Fin. Prods., Inc.*, No. 00 CIV 2474(AGS), 2001 WL 1842042, at *7 (S.D.N.Y. May 30, 2001) (refusing to substantially discount "excessive" hours because the briefs and "results obtained" were both "excellent.").

Overall, this case's procedural history supports finding Defendants' hours estimate "not unreasonable."

### 2.   Other considerations.

The Court concurs with Defendants that this matter raises complex legal issues surrounding federal preemption of H.B. 4204 in the context of a sophisticated mortgage-backed security instrument. Defs.' Mot. for J. & Relief 17. The scope of the matter and its long lifetime weigh in favor of approving Defendants' hours estimate. *See, e.g., Lawtone-Bowles v. City of N.Y.*, 16-CV-4240 (AJN)(OTW), 18-CV-4338 (AJN)(OTW), 2021 WL 1326865, at *3 (S.D.N.Y. Apr. 8, 2021) (awarding relatively high attorney fees and costs because the matter involved complex legal and factual issues).

The Court next considers Defendants' voluntary reductions in attorney fees and costs. *See* Defs.' Mot. for J. & Relief 16; Ascher Decl. ¶ 21; Watnick Decl. ¶ 26. The Court finds these reductions buttress the reasonableness of Defendants' hours estimate and CH fails to illustrate why they should not. CH simply concludes that they should not be considered. Pl.'s Resp. in Opp'n 41. Yet Defendants' reductions, such as time logged by attorneys who spent fewer than five hours on

this case, do in fact seem reasonable.

Finally, this Court will not agonize over Defendants' retention of both Perkins Coie and Jenner & Block. CH urges the Court to ding Defendants for enlisting two national law firms and logging "duplicative," unjustified hours. Pl.'s Resp. in Opp'n 43. According to CH, joint representation presumes irredeemable inefficiency. *Id.* 46. This Court disagrees that retaining counsel from two law firms necessarily means that Defendants litigated in an undisciplined manner.

As Defendants explain, Jenner & Block took lead on preemption questions. Defs.' Reply 32; *see also* Ascher Decl. ¶ 5. Perkins Coie meanwhile ensured litigation continuity, provided institutional knowledge, spearheaded discovery, represented Defendant Midland separately, and served as local counsel. Ascher Decl. ¶ 5.

CH also repines about the number of attorneys staffed on this case, but multiple people working on a case lasting four years "says little about whether those people overbilled or duplicated efforts." *N. Am. Photon Infotech Ltd. v. ZoomInfo LLC*, 20 Civ. 2180 (JPC), 2026 WL 453442, at *6 (S.D.N.Y. Feb. 18, 2026). And the Court does not analyze in a vacuum the number of hours spent on various litigation tasks without compelling evidence of excess. CH simply lists the hours expended by opposing counsel without explaining why they are bloated or groundless. Pl.'s Resp. in Opp'n 45–46.

The Court does not see a compelling reason to reduce the number of hours requested by Defendants. The next question is whether Defendants' requested hourly rates are reasonable.

### ii.  On the whole, Defendants' requested hourly rates are reasonable.

Defendants argue their counsel's hourly rates align with those charged by similar firms "with successful track records litigating complex disputes." Defs.' Mot. for J. & Relief 19.

15 – Opinion and Order

Courts assess "case-specific variables" in determining whether hourly rates are reasonable. *Lilly v. City of N.Y.*, 934 F.3d 222, 230 (2d Cir. 2019) (citation omitted). These variables include, among others, novelty of the issues, skills required, attorneys' customary hourly rates, outcomes, and attorneys' "experience, reputation, and ability." *Id.* at 228 (citation omitted).

Defendants retained counsel from outside Oregon and now seek hourly rates commensurate with those charged by New York, D.C., and Chicago-based attorneys. Defs.' Mot. for J. & Relief 20. Courts may approve extra-district hourly rates if "it is clear that a reasonable, paying client would have paid those higher rates." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany & Albany Cnty. Bd. of Elections*, 522 F.3d 182, 191 (2d Cir. 2008).

CH first argues Perkins Coie attorneys unjustifiably seek Portland hourly rates, rather than Eugene hourly rates. Pl.'s Resp. in Opp'n 38. This Court notes CH also retained counsel from a Portland-based firm. Portland rates are appropriate here and CH confirms as much. *See* O'Connor Decl. ¶ 76 (stating "[i]n this case, the applicable legal market is clearly the market for business litigation in downtown Portland.").

Defendants seek hourly rates for Portland-based Perkins Coie partners, associates, and paralegals at or below the firm's standard rate. Defs.' Mot. for J. & Relief 20 (citing Watnick Decl. ¶ 28). The parties agree the rates claimed by Perkins Coie are at the highest level of those specified in the Oregon State Bar 2022 Survey. Defs.' Mot. for J. & Relief 23; Pl.'s Resp. in Opp'n 38–39.

CH's opposition to Defendants' estimates for Perkins Coie attorneys is relatively circumscribed. CH contends Mr. Watnick and Mr. Tobin should seek lower rates commensurate with their experience "as junior partners." Pl.'s Resp. in Opp'n 39 (quoting O'Connor Decl. ¶ 88). This Court does not necessarily agree. Mr. Watnick and Mr. Tobin have extensive complex litigation experience, graduated from Stanford and Harvard Law Schools respectively, and

completed federal judicial clerkships. Watnick Decl. ¶¶ 12, 15. Plus, courts in this District have approved rates like those at issue here. *See, e.g., Trinh v. Shriners Hosps. for Child.*, No. 3:22-cv-01999-SB, 2025 WL 2972667, at *5–6 (D. Or. Oct. 21, 2025) (awarding up to $975 per hour for partners); *JS Halberstam Irrevocable Grantor Tr. v. Davis*, No. 3:21-cv-413-SI, 2022 WL 1449106, at *5 (D. Or. May 9, 2022) (awarding attorney fee rates up to $1,050 because it accords with a reasonable hourly rate "for complex federal litigation in the relevant communities.").

CH asks this Court to strike any block-billed time entries by Perkins Coie, concluding they are unreasonable. Pl.'s Resp. in Opp'n 47. Without more, the Court should not parse each block-billed time entry. *See* Watnick Decl. Ex. 3 (80-page billing table of work performed by Perkins Coie for Defendant K-Star). Defendants are entitled to their requested fees for Perkins Coie attorneys.

Defendants also seek fees for Jenner & Block attorneys that exceed the highest Portland rates. *See* Ascher Decl. ¶ 24. Specifically, they request between $1,241 and $1,517.25 per hour for work performed by New York and D.C.-based Jenner & Block partners. *Id.*; Defs.' Mot. for J. & Relief 20. The Court recognizes Jenner & Block has a remarkable reputation internationally and that it staffed highly qualified, credentialed, and experienced attorneys on this matter. *See, e.g.,* Ascher Decl. ¶¶ 8–17.

Nonetheless, the rates for Jenner & Block attorneys are limited to the highest rates Defendants seek for Perkins Coie attorneys. The Court understands the law permits approving Defendants' highest requested hourly rates, but it does not mandate this result. This Court is not convinced that Perkins Coie's Portland-based attorneys do not possess the requisite skills and experience to effectively litigate this case, including matters of preemption. *Cf. Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (citation modified) (a presumptively reasonable

fee is one "a reasonable, paying client would be willing to pay," assuming they want "to spend the minimum necessary to litigate the case effectively."); *see also Barjon v. Dalton*, 132 F.3d 496, 500 (9th Cir. 1997) (courts may approve rates outside the forum if local counsel lacked the expertise, experience, or skills to effectively handle the case). It is not clear a reasonable, paying client would have paid the highest rates requested by Defendants to litigate these issues. For instance, Defendants do not argue that the Perkins Coie attorneys lack specific skills or experience crucial to their preemption defense. Accordingly, this Court caps Defendants' requested hourly fees at the highest rates sought for work performed by Perkins Coie attorneys.

### iii. Defendants' costs are reasonable.

Defendants seek costs for court fees, copying, messenger services, deposition expenses, legal research, expert expenses, and discovery vendor costs. Defs.' Mot. for J. & Relief 24 (citing Ascher Decl. Ex. 2; Watnick Decl. Exs. 2, 4). As CH does not challenge Defendants' entitlement to these fees or their estimate, this Court should award Defendants reasonable, actual costs.

### IV.  Defendants can recover against Lawson as Guarantor.

Section 1.2(b)(11) of the Guaranty provides Lawson is responsible as Guarantor for the Loan when CH raises a meritless defense to payment. Furay Decl. Ex. 2, at 4–5 (Section 1.2(b)(11) of the Guaranty). Here, CH's H.B. 4202 defense lacked merit. See Sep. 11, 2025, Am. Op. & Order. The Guaranty's plain terms thus permit Defendants to recover against Lawson given CH's default. The Court enters judgment against Lawson as Guarantor.

/ / / /

/ / / /

/ / / /

/ / / /

18 – Opinion and Order

## **CONCLUSION**

The Court finds CH liable for the remaining amounts owed under the terms of the Loan Agreement, including attorney fees and costs, and permits Defendants to update their estimates. The only adjustment is that Jenner & Block's hourly rates are limited to the highest rates requested for work performed by Perkins Coie attorneys. The Court also enters judgment against Lawson as Guarantor. For the reasons explained in this Opinion, Defendants' Motion for Relief and Entry of Judgment, ECF No. 217, is **GRANTED** in part and **DENIED** in part. The Court will, in a separate Order, set out dates by which Defendants are to file their proposed judgments.

IT IS SO ORDERED.

DATED this 5th day of June 2026.

_____s/Michael J. McShane_____
Michael McShane
United States District Judge

## APPENDIX A: Detailed Procedural History

1. **Initial Complaint Phase**
   a. In December 2021 Plaintiff CH filed this suit against Defendants in Benton County Circuit Court. Compl., ECF No. 1-1.
      i. Defendants removed to federal court on diversity grounds, answered, and filed counterclaims. Notice of Removal, ECF No. 1; Answer, ECF No. 5.
      ii. CH then moved to remand on abstention grounds. Mot. to Remand, ECF No. 7.
          1. This Court **denied** CH's Motion to Remand. Jun. 6, 2022, Op. & Order, ECF No. 16.
   b. Defendants moved for judgment on the pleadings on all CH's claims. Mot. for J. on the Pleadings, ECF No. 18.
      i. The Court **granted** Defendants' Motion in full, dismissing Claims I and IV with prejudice and dismissing Claims II and III without prejudice. Oct. 18, 2022, Op. & Order, ECF No. 31.

2. **The *Lawson* Suit**
   a. In July 2022, Defendant Wilmington filed suit against William Lawson, the Guarantor for the Loan. *See generally Wilmington Tr. v. Lawson*, No. 6:22-cv-00993-MK (D. Or. Jul. 8, 2022).
   b. CH moved to consolidate *Lawson* (22-993) with *Corvallis Hospitality* (22-24), the lead case. Mot. to Consolidate, ECF No. 28.
      i. This Court **granted** CH's Motion to Consolidate. Sep. 6, 2022, Order, ECF No. 30.
   c. In February 2023, Defendant Lawson filed a counterclaim against Wilmington. Lawson Answer, ECF No. 48.

3. **The First Amended Complaint Phase**
   a. In November 2022, CH filed a First Amended Complaint ("FAC"). FAC, ECF No. 32.
   b. Defendants moved to dismiss Plaintiff's FAC and Lawson's Counterclaim. Mot. to Dismiss, ECF No. 34; Mot. to Dismiss Lawson Countercl., ECF No. 49.
      i. This Court **dismissed** Lawson's Counterclaim in full. Apr. 28, 2023, Op. & Order, ECF No. 59.
      ii. The Court **dismissed** CH's FAC in part. Apr. 28, 2023, Op. & Order, ECF No. 58.
          1. Remaining were CH's breach of contract claims and its breach of the covenant of good faith and fair dealing claim.
   c. Defendants answered what remained of the FAC and brought counterclaims. FAC Answer, ECF No. 64.

4. **The Discovery Phase**
   a. Discovery took two years to complete in part because the schedule was extended eight times. Watnick Decl. ¶ 7, ECF No. 218.

    b.   Discovery was also contentious, with this Court adjudicating multiple Motions to Compel. *See, e.g.,* ECF Nos. 102, 106, 116.

5. **The Second Amended Complaint Phase**
   a.  In November 2024, CH moved for leave to file a Second Amended Complaint. Mot. for Leave to File Am. Compl., ECF No. 114. CH added new claims and K-Star as a new party because K-Star replaced Midland as the Loan's special servicer. *Id.*
       i.  This Court **granted** CH's Motion for Leave to File a Second Amended Complaint. Jan. 10, 2025, Order, ECF No. 124.
   b.  Shortly before summary judgment briefs were due, CH moved for referral to a judicial settlement conference. Mot. for Referral to a Judicial Settlement Conf., ECF No. 132.
       i.  This Court **denied** CH's Motion for Referral to Judicial Settlement Conference. Mar. 6, 2025, Order, ECF No. 162.

6. **The Summary Judgment Phase**
   a.  Both sides moved for summary judgment. *See* ECF Nos. 139, 141, 165, 166, 183, 186.
   b.  CH also moved for sanctions. *See* ECF Nos. 149, 167, 191, 195.
   c.  The Court heard oral argument on the parties' Motions for Summary Judgment and Sanctions in July 2025.
       i.  This Court **denied** CH's Motion for Sanctions. Sep. 11, 2025, Am. Op. & Order.
       ii. The Court **denied** summary judgment as to: (1) whether Defendants had breached the Loan Agreement because the Loan's Master Servicer (Wells Fargo, not a party to this case) mistakenly paid an insurance payment to "Marsh USA" and (2) whether the Loan Agreement's default interest and related fee provisions were unenforceable for purposes of calculating Defendants' damages. *Id.* 15–16, 21–22.
       iii. The Court also **denied** summary judgment against Defendants' claim for breach of guaranty against Lawson. *Id.* 23.
   d.  CH asked the Court to reconsider the issues presented at summary judgment. Mot. for Recons., ECF No. 202.
       i.  This Court **denied** CH's Motion for Reconsideration. Dec. 19, 2025, Order, ECF No. 213.

7. **The "Owing" Phase**
   a.  This Court held a status conference on January 5, 2026, to discuss whether the case should proceed to trial or continue with motion practice. Jan. 5, 2026, Hr'g Tr., ECF No. 216.
   b.  This Court declared that the remaining issues are not appropriate for trial. *Id.* 8:20–24. The Court then set oral argument to consider attorney fees and costs as well as other amounts owed to Defendants under the Loan Agreement. *Id.* 13:12–15.
       i.  Defendants' instant Motion for Relief and Entry of Judgment is the Motion authorized by this Court in that conference. *Id.* 11:5–11.

    c.   Oral argument on Defendants' Motion for Relief and Entry of Judgment occurred on May 28, 2026. This Opinion and Order followed shortly thereafter.

**APPENDIX B: Analysis of Costs and Fees Under the Loan Agreement**

a. **Outstanding principal.**

The Loan Agreement permits advancement of the principal upon default. Furay Decl. ¶ 12 (quoting Ex. 1, at 77 (Section 10.1(b) of the Loan Agreement)). As of October 1, 2025, the outstanding principal was $15,232,549.15. *Id.* ¶ 20 (citing Ex. 3 (Loan's transaction history)). CH does not contest the principal balance, but argues Defendants unwound the Loan's acceleration and thus waived the right to claim default. Pl.'s Resp. in Opp'n 18.

CH specifically contends Defendants de-accelerated the Loan in a March 31, 2021, letter. Pl.'s Resp. in Opp'n 9; *see also* Furay Decl. Ex. 5 (Mar. 31, 2021, letter to CH regarding "certain Events of Default."). Defendants argue CH waived its de-acceleration argument. Defs.' Reply 5. And had CH not waived it, Defendants claim they reserved all rights with respect to CH's 2020 default while engaging in unsuccessful modification negotiations. *Id.* 7.

This Court concludes CH owes the principal balance of the Loan on account of its 2020 default. For one, this Court already found that Defendants' October 7, 2020, letter notifying Plaintiff that the Loan had been accelerated was valid. Sep. 11, 2025, Am. Op. & Order 14. The Court also determined Plaintiff breached its obligations under the Loan Agreement by missing payments. *Id.* 13–14.

Second, Defendants did not de-accelerate the Loan and thus waive default per the Loan Agreement's text. Section 10.4 provides that "each Event of Default shall continue unless and until the same is waived by Lender in writing in its sole and absolute discretion in accordance with the terms and provisions of the Loan Documents." Furay Decl. Ex. 1, at 79. CH does not allege Defendants expressly de-accelerated the Loan or waived their right to seek default remedies in writing. CH instead contends Defendants' Notice of Foreclosure based on late payments in 2021

"unequivocally" waived their right to claim default based on missed payments in 2020. Pl.'s Resp. in Opp'n 10. This is a bridge too far.

### b. Interest.

Section 2.2.1 of the Loan Agreement specifies a regular interest rate throughout the term of the Loan as well as a default interest rate. Furay Decl. ¶¶ 21, 25 (quoting Ex. 1, at 7 (Section 2.2.1), 107 (Sched. I)). CH alleges the default interest rate of 9.550% per year amounts to an unenforceable penalty, but does not challenge Defendants' calculations. Pl.'s Resp. in Opp'n 18. The outstanding default interest is $4,492,369.77. Furay Decl. ¶ 26 (citing Ex. 8 (Default interest table)).

An agreement to pay a higher interest rate in the event of default is an agreement to pay interest and not a penalty unless usurious. *E.g., Wilmington Tr., Nat'l Ass'n v. Winta Asset Mgmt. LLC*, 20-CV-5309 (JGK) (VF), 2023 WL 9603893, at *5 (S.D.N.Y. Dec. 21, 2023). The party contending default interest is an unenforceable penalty bears the burden of proffering evidence that enforcement is unconscionable. *AXA Inv. Managers UK Ltd. v. Endeavor Cap. Mgmt. LLC*, 890 F.Supp.2d 373, 388 (S.D.N.Y. 2012) (citation omitted). A party can meet its burden by showing that the prescribed damages are grossly disproportionate to the anticipated injury. *Id.*

This Court will enforce the default interest rate. CH has not provided evidence that either the provision of the Loan Agreement allowing default interest or the rate itself is so unreasonable as to warrant nullification. *See, e.g., Wells Fargo Bank Nat'l Ass'n as Tr. for Holders of Comm 2014-UBS6 Mortg. Tr. Com. Mortg. Pass-Through Certificates v. 366 Realty LLC*, 725 F.Supp.3d 272, 284 (E.D.N.Y. 2024) (holding defendants, in pointing only to the default interest amount, have not shown the provision of default interest is procedurally or substantively unconscionable). The default rate is within the bounds of those in similar Loan Agreements. *See* Sep. 11, 2025, Am.

Op. & Order 21. CH maintains the rate isn't the issue and urges this Court to nullify default interest solely because it serves as "additional servicing compensation" for the Loan servicers. Pl.'s Resp. in Opp'n 19. Yet CH concedes that default interest compensates lenders for administrative expenses and inconvenience. *Id.* 18.

At the end of the day, CH agreed to the Loan's terms, including default interest. Courts generally interpret contracts according to their clear, unambiguous terms. *See, e.g., U.S. Bank Nat'l Ass'n v. Kontogiannis*, CV-13-1090 (WDW), 2013 WL 12108071, at *3 (E.D.N.Y. Sep. 27, 2013) (citation omitted) (an unambiguous clause calling for acceleration and default interest is generally enforceable); *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992) (New York law requires courts to interpret a written contract according to the intent of the parties as expressed in the document's unequivocal language). Section 2.2.2 unequivocally provides for a default interest rate. Furay Decl. Ex. 1, at 7.

Finally, in assessing contract enforceability, New York courts consider whether the parties are sophisticated and represented by capable counsel. *E.g., AXA Inv. Managers UK Ltd.*, 890 F.Supp.2d at 388. CH has not alleged that it lacked competent counsel or a favorable bargaining position and thus does not show that the Loan Agreement is unconscionable.

### c. Late fees.

Section 2.3.3 of the Loan Agreement provides for late fees if any principal, interest, or other sum due under the Loan is not paid by the due date. Furay Decl. ¶ 27 (quoting Ex. 1, at 8 (Section 2.3.3 of the Loan Agreement)). Outstanding late fees total $805, 570.20. *Id.* ¶ 28 (citing Ex. 9 (Late charges breakout)). According to CH, collecting late fees after acceleration contravenes New York law unless the parties modify this general rule through contract. Pl.'s Resp. in Opp'n 21.

25 – Opinion and Order

This Court should enforce the late fees provision. CH agrees the Loan Agreement permits Defendants to charge late fees for delinquent payments. Pl.'s Resp. in Opp'n 21. New York law also contemplates late fees for accelerated loans. *See, e.g., 4 B's Realty 1530 CR39, LLC v. Toscano*, 818 F.Supp.2d 654, 663 (E.D.N.Y. 2011) (courts calculate late fees up until the date of a loan's acceleration).

Here, as permitted by law, Defendants are entitled to late fees until October 7, 2020, the date of acceleration. Furay Decl. Ex. 9; *see also RSS WFCM2018-C44-NY LOD, LLC v. 1442 Lexington Operating DE LLC*, 21-CV-4424 (DLC) (VF), 2024 WL 4486058, at *4 (S.D.N.Y. Aug. 19, 2024) (validating plaintiff's calculation of late fees from the date of default through the date of acceleration). Contrary to what CH argues, the late fees stem from CH's failure to make payments in 2020, and only prior to the October 7, 2020, acceleration date. Defs.' Reply 14 (citing Furay Decl. Ex. 9; Furay Reply Decl. ¶ 12 (citing Ex. 3 (Loan's transaction history) and explaining the transaction history automatically lists post-acceleration late fees, though Defendants are not charging them)).

### d. Expenses.

Under Section 11.13(a) of the Loan Agreement, CH must indemnify Defendants for reasonable costs and expenses associated with CH's performance of its Loan obligations and any enforcement activities. Furay Decl. ¶ 29 (quoting Ex. 1, at 84 (Section 11.13(a)). Reasonable costs and expenses include reasonable attorney fees and disbursements. *Id.* Outstanding expenses total $3,125,164.06. *Id.* ¶ 30 (citing Ex. 10 (Legal fee invoice summary)).

Defendants allege they can seek reimbursement of reasonable expenses, including attorney fees and costs, under New York law. Defs.' Mot. for J. & Relief 12; *see also Wells Fargo Bank as Tr. for the Benefit of the Holders of COMM 2015-LC19 Mortg. Tr. Com. Mortg. Pass-Through*

*Certificates v. 5615 N. LLC*, 20-CV-2048 (VSB) (KHP), 2023 WL 7394340, at *7 (S.D.N.Y. May 4, 2023) (quoting *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008)) (courts may award reasonable attorney fees and costs when there is "sufficiently clear" contractual language providing for them).

CH challenges the Loan Agreement's provision of attorney fees and costs as "expenses" under Section 11.13(a). Pl.'s Resp. in Opp'n 23. Section III *supra* analyzes whether CH must indemnify Defendants and whether Defendants' estimates for attorney fees and costs are reasonable.

### e. Yield maintenance premium.

Section 2.4.3 of the Loan Agreement requires CH to pay a yield maintenance premium in the event CH tenders a "voluntary prepayment.". Defs.' Mot. for J. & Relief 12 (citing Furay Decl. ¶ 33 (quoting Ex. 1, at 10 (Section 2.4.3))). A voluntary prepayment occurs when a borrower prepays all or any part of the outstanding Loan balance after or during default. Furay Decl. Ex. 1, at 10. As of October 5, 2025, the yield maintenance premium totaled $769,739.28. *Id.* ¶ 35 (citing Ex. 11 (Prepayment charge table)).

Defendants are entitled to the yield maintenance premium according to Section 2.4.3 of the Loan Agreement. CH avers the Agreement does not unambiguously require a yield maintenance premium post-acceleration, only after default. Pl.'s Resp. in Opp'n 24. This is a distinction without a difference. Section 2.4.3 clearly states prepayment after default triggers a yield maintenance premium. Furay Decl. Ex. 1, at 10. CH fails to illustrate why it matters whether the clause also specifies that a yield maintenance premium is due "post-acceleration."

### f. Special servicing fees.

Under Section 11.24(a) of the Loan Agreement, CH is liable for fees and expenses associated with "any special servicing or workout of the Loan or enforcement of the Loan documents." Furay Decl. ¶ 36 (quoting Ex. 1, at 92 (Section 11.24(a)). Outstanding special servicing fees total $221,480.69. *Id.* ¶ 39 (citing Ex. 12 (Special servicing fees table)).

Defendants explain the special servicing fees indemnify them for the time and effort the servicers spent engaging in modification negotiations with CH and managing the Loan. Defs.' Mot. for Relief 13; *see also* Furay Decl. ¶ 38. The basis of CH's opposition to special servicing fees is that the calculations only appear in the Trust's Pooling and Service Agreement ("PSA") and not the Loan Agreement. *Id.* Pl.'s Resp. in Opp'n 14–15. CH contends it cannot be bound by language in the PSA as a non-party to the document. *Id.* 14.

CH owes the special servicing fees under Section 11.24(a). CH offers no authority for its argument that special servicing fees whose calculations appear only in the PSA are unenforceable. In fact, New York courts routinely validate such fees. *E.g., Winta Asset Mgmt.*, 2023 WL 9603893, at *6 (requiring defendants to pay the special servicing fee as calculated in the PSA).

### g.  Liquidation fee.

In addition to special servicing fees, Section 11.24(a) obligates the borrower to indemnify Defendants for a liquidation fee arising from "the exercise of all remedies under the Loan Documents." Furay Decl. ¶ 40 (citing Ex. 1, at 92 (Section 11.24(a)). The outstanding liquidation fee is $249,824.72. *Id.* ¶ 42 (citing Ex. 7 (Payoff Review Form)).

CH again asserts Defendants are not entitled to a liquidation fee because the underlying calculations appear only in the PSA and they are too vague. Pl.'s Resp. in Opp'n 24. The PSA defines the fee as one percent of the Loan proceeds. Furay Reply Decl. ¶¶ 6–7 (citing Ex. 15, at 74). This is sufficiently definite and accords with liquidation provisions in similar contracts. *See,*

*e.g., 5615 N. LLC*, 2023 WL 7394340, at *10 (liquidation proceeds calculated as 1% of the sum of the balance due, provided the amount is less than $1,000,000).

CH also argues the loan has not been liquidated and so it does not owe this fee. Pl.'s Resp. in Opp'n 25. Defendants concede the Loan has not been "resolved" and asks this Court to validate the liquidation fee that Defendants will update and charge after the Loan's resolution. Defs.' Reply 17.

The Court will issue judgment specifying that CH will owe a final liquidation fee after the Loan is resolved. *See 5615 N. LLC*, 2023 WL 7394340, at *10 (in the event the property at issue is foreclosed, the servicer will be entitled to a liquidation fee calculated at time of foreclosure).

### h. Interest on advances.

Finally, Section 11.24(a) also provides for interest on advanced payments made by the servicers for attorney fees, taxes, and insurance. Defs.' Mot. for J. & Relief 14 (citing Furay Decl. ¶¶ 43–44 (citing Ex. 1, at 92 (Section 11.24(a))). Outstanding interest on advances is $335,598.80. Furay Decl. ¶ 45 (citing Ex. 13 (Interest on advances breakout table)).

CH argues advances are "entirely unnecessary" when Defendants have not identified the nature of the advances and whether they are in fact authorized by the Loan Agreement. Pl.'s Resp. in Opp'n 15–16. CH also avers it should not be liable for interest on advances at an unspecified rate. *Id.* 16. Yet the PSA designates the Prime Rate for interest on advances. Furay Reply Decl. ¶ 15 (citing Ex. 15, at 102). The record also contains a line-by-line accounting of interest on advances expenses. *See* Furay Decl. Ex. 13.

This Court awards interest on advances. CH cites *366 Realty, LLC* to support its argument that interest on advances is unenforceable because the interest rate does not appear in the Loan Agreement. 725 F.Supp.3d at 295 (recommending against plaintiff receiving interest on advances

since the loan agreement and other documentation omitted the rate and specific calculations). But unlike here, that case did not involve a PSA. As recommended for other categories of expenses, this Court holds that calculations, rates, and other requirements that appear in the PSA are enforceable. *Cf. Appaloosa Inv. L.P.I. v. Fed. Home Loan Mortg. Corp.*, No. 20-1708, 2022 WL 2720520, at *4 (2d Cir. Jul. 14, 2022) (interpreting the PSA provision governing interest on advances and remanding to the district court to determine the proper manner of payment).